**James Lee MARION, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 37297.**

Court of Criminal Appeals of Texas.

Dec. 2, 1964.

Rehearing Denied Feb. 3, 1965.

Second Motion for Rehearing Denied March 10, 1965.

Carl Steckelberg, Garland Casebier, Midland, for appellant.

Joseph H. Mims, Dist. Atty., Midland, Alton R. Griffin, Dist. Atty., Lubbock, and

Leon B. Douglas, State's Atty., Austin, for the State.

MORRISON, Judge.

The offense is murder; the punishment, death.

The Turner house in Midland occupied an entire city block. Mr. Turner was away and his wife was at home alone. At approximately 4:12 a. m. on October 29, three of the Turners' neighbors heard screams somewhere in that neighborhood. Neighbor Galley notified the police and within four minutes patrols reached the area. They cruised throughout this vicinity until daylight, but were unable to discover anything suspicious. At 7:40 the Turners' maid, Juanita Young, appeared for work and when she observed muddy tracks both outside and inside the house, she retreated to a neighbor's home and called Mr. Scharbauer, Mrs. Turner's son-in-law. He arrived with his wife and asked the neighbor to call the Sheriff, and the Scharbauers and the maid proceeded to the Turner home. He and the maid ascended the stairs and discovered that Mrs. Turner's bedroom door had been battered in with a pinch bar and inside they found her lifeless blood stained body on the floor. They descended the stairs and went outside to greet the Sheriff. Mrs. Scharbauer was left alone in the library crying. An armed colored man, whom she identified as the appellant, entered and asked her if she lived there and when she answered in the negative, hit her on the head with the pistol he was carrying. At this juncture Scharbauer, the Sheriff and a deputy entered and appellant surprised them and, at pistol point and by means of threats to further harm Mrs. Scharbauer, lined them up in the library. After some hesitation appellant abandoned his dominion over the four and ran out the front door. The maid and the yard boy were outside and saw him leave. Chase ensued, but he was able to evade his pursuers. Some four hours later he was apprehended in the attic of a small business armed with a .380 revolver. On the floor in the room below

the entrance to the attic was found an identification holder containing a picture of Mr. Turner.

Soon after the discovery of Mrs. Turner's body the coroner arrived. He and a pathologist testified that massive bruises about the face and head, administered by a weapon similar to the .380 pistol, caused Mrs. Turner's death. The pistol was shown by expert testimony to have hair comparable in many respects to samples taken from the corpse imbedded in the butt and clip thereof. Samples of mud taken from appellant's shoes were shown to have the same soil characteristics as that found in the Turner home. Three buttons found in or near Mrs. Turner's bedroom matched those on the shirt appellant was wearing and from which three had been recently torn. Plaster casts were made of footprints outside the Turners' window and appellant's shoes were shown to fit the same perfectly. Appellant's pants had flecks of human blood thereon.

We have concluded that the above is a fair summary of the many witnesses, lay and expert, as to the physical facts of this case which took a week to try.

After appellant's arrest at 11:50 a. m., he was interrogated by Officers Gideon and Morales and at 1:15 p. m. signed a confession in which he recites that the murder occurred as the result of a burglary and attempt to rob Mrs. Turner. The appellant had remained in the big house until the next morning when a loud noise awoke him and he escaped by means of placing the people in the house in fear of being shot. Prior to the taking of the confession appellant was warned by Officer Gideon of his right to remain silent concerning the offense about which this statement is made. Officer Gideon affirmatively answered to appellant's counsel's question, "Did you suggest to him that he should have counsel?", and stated that appellant had said that he just wanted to get it over with. He testified further that there was a telephone nearby and that he told appellant he might use it if he wanted to call a lawyer. At 3:50 p. m. appellant was arraigned before the Justice of the Peace who testified in answer to appellant's counsel's question that he felt he had performed his duty toward appellant when he told him of his rights as a citizen and asked him if he wanted a lawyer.

Dr. Shaw, a psychiatrist, examined appellant later in the afternoon for 10 or 15 minutes, found no marks or physical injury, and found him to be oriented as to time, place and identity. On October 30, Dr. Shaw and Dr. Youngblood, also a psychiatrist, examined appellant psychiatrically for approximately an hour and again on November 11, for a like period of time and expressed the opinions that appellant knew the consequences of the act at the time of its commission and knew the difference between right and wrong.

On November 15, Officer Morales, the Sheriff and an assistant district attorney being present, again interrogated appellant, warned him of his right to remain silent, advised him that anything he might say could be used against him, and a fuller confession was reduced to writing and signed by appellant. Following this, appellant was again examined by Dr. Shaw.

Appellant was not called as a witness, but Dr. Kovnar, a psychologist, testified that he had given appellant repeated tests used by those in his profession and expressed the opinion that appellant was of dull-normal intelligence with a propensity for homosexuality and reacted to primitive impulses when given alcohol. He did not express an opinion as to whether or not appellant knew the difference between right and wrong.

Dr. Schlenker, a psychiatrist, testified that he had conferred with Dr. Kovnar and had examined appellant for about 40 minutes. He expressed the opinion that the psychiatric tests showed that appellant would release hostilities when under the influence of alcohol. In answer to a hypothetical question, he testified that in his opinion appellant did not understand the nature and

quality of his act or know that he would be punished if he were caught.

■ The jury resolved the controversial issue in the case when they found appellant to be sane, and we find the evidence sufficient to support the conviction.

■ Appellant's objections to the admission of the confessions are presented in his motion to exclude the same filed before testimony was taken and renewed upon the offer of each confession. The principal grounds for such objections are that he was not represented by counsel at the time the confessions were made. Principal reliance is had upon Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, but in that case it was affirmatively shown and the opinion of the Court emphasizes that Escobedo requested and was denied an opportunity to consult with his lawyer.

We here observe that appellant was advised of his right to remain silent, had it suggested to him that he could call counsel, and a telephone was made available for his use before either confession was made. Appellant declined to use the telephone and failed to make any effort to comply with the suggestion.

■ He next contends that the statement found in his confession, "I was drunk when I broke into the house" constitutes an exculpatory statement. Drunkenness is no excuse for the commission of crime, Article 36, Vernon's Ann.P.C., and the trial court so told the jury. He contends that because his expert witnesses had testified that appellant "suffered from a mental condition which stimulated or aggravated by the recent use of alcohol rendered him temporarily insane", and because his witness White testified that he was intoxicated on the night in question, the phrase "I was drunk" was exculpatory. "I was drunk" standing alone is not exculpatory. It was appellant and not the State who offered the additional testimony which he says made the statement "I

was drunk" exculpatory. The court was not required to so charge.

■ Appellant next contends that the court erred in permitting Coroner Ellis to testify as to injuries which he observed on the grounds that other witnesses who had preceded Ellis to the witness stand had already testified about such injuries. He cites the admonition contained in the majority opinion on rehearing in Kennedy v. State, 161 Tex.Cr.R. 303, 276 S.W.2d 291. He concedes that their testimony was not identical and we agree. It is only identical testimony which the majority frowned upon in Kennedy.

■ He further contends that the court erred in permitting the pathologist to use a plastic skull which was manufactured by the Medical Plastic Laboratory of Gatesville, Texas, which she stated was a correct replica of the human skull, in order to make her testimony clearer for the jury as to the cause of death. Surely such a model does not come within the ghastly picture or bloody clothes rule expressed in Borroum v. State, 168 Tex.Cr.R. 552, 331 S.W.2d 314 (since overruled) and Hunter v. State, 161 Tex.Cr.R. 225, 275 S.W.2d 803.

The trial court submitted the defense raised by the testimony of appellant's witnesses, and we overrule his contentions that the court erred in not granting his motion for new trial based upon the contention that the jury verdict was against the preponderance of the evidence.

■ His last contention is that the court erred in admitting the testimony of the Sheriff as to a statement made by appellant while he was holding the four under his domination at gun point in the library. The Sheriff testified that Mr. Scharbauer asked appellant's permission to allow him to attend to his wife's injuries. Appellant denied such request and instructed him to "straighten up there" and said, "Do you want her to live?" Clearly the statement

was made during and in furtherance of the appellant's flight from the scene of the homicide and therefore admissible.

Finding no reversible error, the conviction is affirmed.