

No attorney on appeal for appellant.

Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, ninety-nine years.

**Daniel Odell McDONALD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 38259.**

Court of Criminal Appeals of Texas.

Oct. 4, 1965.

Rehearing Denied Nov. 17, 1965.

The deceased, a widow, age 82, operated a suburban grocery store consisting of two rooms. The front room was used for the store and she lived alone in the rear room. At approximately 6 A.M., June 12, 1964, the body of the deceased was found on the bed in the rear room. The body bore four small puncture wounds in the left breast, a cut upper lip, male sperm in the vagina, and a plastic bag was pulled down over her head and twisted on one side. A fork with blood on it was found near the body. The building had only two outside doors, one in the front which was open and the rear door was closed and locked, when the body was found. There were no signs of a forced entry into the building.

An autopsy performed on the body of the deceased showed that her death was caused by strangulation, although the puncture wounds in the breast may have contributed to her death. It was estimated that she had been dead at least six hours when the body was found. A physician expressed the opinion that the wounds in the left breast could have been inflicted with the fork exhibited to him while he was testifying.

The fork had been identified as the one found near the body.

The appellant, age 19, was in military service and had returned home on leave on June 11. Appellant's brother, M. J. McDonald, who lived about two blocks from deceased's store, testified that appellant was staying at his home while on leave; that he first saw the appellant about 6 P.M., June 11, and loaned him his car about 6:30 or 7 P.M., and the appellant left in the car going to visit a friend and had not returned about 11 P.M.; and that the appellant was in his home about 6:30 or 7 A.M. the following morning, June 12.

At approximately 3 P.M., June 12, boot tracts were discovered near the store of the deceased, and they led to and ended at the left front door of the place where a car had been parked for a short time about 11:30 P.M. the previous night about two blocks from the store.

The car used the night of June 11, by the appellant which belonged to M. J., his brother, and a pair of boots of the appellant which were taken from the bedroom occupied by him were taken to the scene of the tracks found near the store. From a comparison made about 4:30 or 5 P.M., June 12, of the car tracks and the boot tracks, respectively, the testimony reveals that they appeared to be the same. The testimony further shows that the appellant's brother delivered to the officers a handbag, some gloves and $132 in money contained in the bag, which he had taken from the bedroom occupied by the appellant the previous night.

The testimony shows that the appellant made two written statements to Sheriff Saunders, one on June 12, and the other June 24, and that they were made in compliance with the provisions of Art. 727, C.C.P. The statements were admitted in evidence.

The statement dated June 12, recites in part as follows:

"My name is Daniel Odell McDonald and I am a white male, 19 years old, I was born September 18th, 1944. * * * I am presently on leave, (from the Army.) * * * Last night I borrowed my brother M. J. McDonald's car. * * * It was about 7 or 7:30 P.M. at that time. * * * I got back in to Stanton about 10:45 P.M. and saw my grandmother McDonald's light still on in the back of the store where she lives. I circled around the store a couple of times and then parked my car one block north and one block east of the store. I walked to the back door of Granny's house and hollered at her. She asked me what I wanted and I told her I wanted some money. She asked me what for and I told her I was in trouble. She then opened the door and let me in. I told her I needed $200.00. She asked me what I had done and I didn't answer. I just grabbed her around the mouth and turned the light off. She put up a fight but I pushed her over on the bed and held my hand over her mouth and nose real tight. There was a plastic bag hanging on a little clothesline in the room. After I held my hand over her mouth about five minutes I let her go. And she was making an awful noise. So I grabbed the plastic bag and held over her mouth. She quit gurgling then. I raped her. I wasn't sure she was dead so I put the plastic bag over her head to make sure. I started looking for money, bills. I didn't want any silver, it was too hard to handle. I found a big fork so I stabbed her several times with it. I was pretty sure she was dead, I don't know why I stabbed her. I got $170.00 and something. I don't remember just how much. I got the money out of the cash drawer and out of cigar boxes next to the cash drawer. I unwired the front screen and left. I went back to the car. It had stopped raining at that time. I was in Granny's house about an hour and a half or two hours. I spent a little money today and some more is in my bags at M. J.'s

house. I have some here in my billfold. I went through the eighth grade in school. I can read and write the English language. I have read the above statement and it is true and correct."

The other statement dated June 24, reads in part as follows:

"My name is Daniel Odell McDonald and I am a white male, 19 years old. I was born September 18th, 1944, my home is at Stanton, Texas. The night I killed and raped my grandmother, Mrs. Delzee McDonald, I was not in Army uniform. I had on a blue checked western shirt, white jeans, white T shirt, jockey shorts and boots. I have examined a handkerchief shown me by Sheriff Dan Saunders, it is my handkerchief, I had it on the night of June 11, 1964, and used it after I raped my grandmother. * * * I left it on the bed."

The appellant did not testify or offer any evidence in his behalf.

The trial court held a separate hearing in the absence of the jury on the issue of the voluntary nature of the written statements of the appellant, and prior to their admission in evidence before the jury made an independent finding that they were voluntarily made.

■ The issues as to the voluntary nature of the written statements were properly submitted to the jury in the Court's charge.

■ The evidence is sufficient to support the conviction.

Reversal is sought only on the ground that the written statements were unlawfully obtained from the appellant in that he was not advised that he was entitled to be represented by counsel before they were made or that he had the absolute right to remain silent and not make any statement.

Following the finding of deceased's body about 6 A.M., June 12, the appellant was in the store with other members of the family during the morning while the investigation was being conducted.

After the discovery of the boot tracks leading from the store to the tracks where a car had been parked, Officers Bruton and Posey went to M. J.'s home where they found M. J. and the appellant standing in the yard. Bruton asked M. J. to bring his car to the scene of the tracks in question and also asked the appellant to come. After they arrived "He (appellant) just stood around," while test tracks were being made with M. J.'s car. When the appellant was asked if he stopped his car there (meaning the place where the parked car was seen), he replied that he had stopped somewhere but he did not remember the place because he had been drinking. Bruton showed the appellant the car tracks, and how they compared, and they observed the boot tracks as they walked the route of the boot tracks leading from the store to where a car had been parked.

Officer Bruton testified in part as follows:

\*    \*    \*    \*    \*    \*

"Q. While you were talking to him (appellant) did he step out and put his foot beside one of 'em (boot tracks) and it didn't fit?

"A. Yes.

"Q. He did that voluntarily to show it didn't fit?

"A. I think he did that voluntarily. Because I could see that it didn't fit anyway.

\*    \*    \*    \*    \*    \*

"Q. By showing him how much you had you were attempting to impress upon him, looky, you might as well tell us about it, you might as well give a statement?

"A. I guess you could put it that way, partially it was.

"Q. What was the other purpose?

"A. I wanted him to know what we had, because I have never misrepresented anything, and I told him that I didn't.

\* \* \* \* \* \*

"Q. Is there something in the statement (witness' statement) that said something that you didn't say? Go ahead.

"A. No, right here I said I stated to him that in my 40 years or so peace officer work and investigation made of murders and other crimes that I had never misrepresented anything to a defendant or anyone to get a statement, or never promised anything or never mistreated them or used any force.

\* \* \* \* \* \*

"Q. Okay. But at the end of this conversation have you told us all you can remember? Did the boy make any comment?

"A. Yes, sir, in substance he said that he knew we had him.

"Q. Can you tell me what words he used, Jake? That's very important.

"A. As near as possible, 'I knew you had me.'

"Q. What does your statement there say his comment was? It was made just the day before, it would probably be fresher.

"A. 'At this point he dropped his head and said he knew that he was caught.'

\* \* \* \* \* \*

"Q. Was it shortly after he said, 'Well, I guess you have got me,' or something to that words, that Dan—words to that effect—that Dan Saunders (sheriff) drove up from getting the boots?

"A. He might have already been there. But anyway, when I noticed he was there I believe he was arriving as we came back (from observing the boot tracks) to the police car.

\* \* \* \* \* \*

"Q. Where was Odell (appellant)? Was Odell standing right there by you?

"A. Right beside of me.

\* \* \* \* \* \*

"Q. Was anything said there?

"A. Yes.

"Q. Who said it?

"A. I did.

"Q. To whom?

"A. Dan Saunders (sheriff).

"Q. What did you say?

"A. I said, 'This is the boy that did it, he is ready to make a statement.'

"Q. Did the boy say anything at that time?

"A. I asked him, I said, 'Odell, who do you want to make the statement to,' and he said, 'Dan Saunders,' and something to the effect if he could go to the courthouse.

"Q. But now, when you said, 'This is the boy that did it, he wants to make a statement,' at that time and following that statement did the boy say anything?

"A. I don't think he said a word except that he wanted to make it to Dan.

"Q. In response to your question as to who?

"A. That's right, I just asked him, I said, 'Odell, who do you want to make the statement to,' and he

said, 'To Dan,' and something about if he could let—I believe if he could go north with him, to not go by his Dad's house.

"Q. That was his statement, 'I'll go with Dan but I want to go a certain direction'?

"A. That's materially it.

"Q. Before he ever got to the car?

"A. We was all standing right there.

"Q. I see. Go ahead.

"A. That's the last I saw of Odell then."

Sheriff Saunders arrived at the scene between 5 and 6 P.M., June 12, which was after the car tracks had been compared and after the boot tracks had been found. When Sheriff Saunders and Officer Smith returned from M. J.'s house with the boots, the sheriff took the appellant into custody. Sheriff Saunders in the absence of the jury testified on cross-examination as follows:

"A. When he got in the car I didn't say anything to him. I was fixing to ask him a question and—but he told me before I had time to ask him a question if I would take him to the courthouse he would tell me all about it.

"Q. I see. And that was the first words he said to you?

"A. Yes, sir.

"Q. Is that the only words he said before he got to the courthouse?

"A. No, sir.

"Q. Did you say anything to him on the way to the courthouse at all?

"A. He asked me if I would not drive by his father's house on the way to the courthouse.

"Q. Did he evidence any reason for that, or just make the statement?

"A. He just made the statement. And I told him I would not, and I didn't.

"Q. Anything else he said to you?

"A. Yes, sir.

"Q. Give me that.

"A. On the way to the courthouse he told me that he had one request.

"Q. Uh-huh.

"A. That he did not want to see any of his folks. And the way I remember it he said, 'I mean any of them.' And I told him that would be granted."

Sheriff Saunders further testified that the appellant was not hand-cuffed, appeared to be normal, and spoke in a quiet voice as they arrived at the courthouse about 6 P.M. The justice of the peace was not available when they arrived at the courthouse. After warning by the sheriff in compliance with the provisions of the statute, the appellant made to him a written statement dated June 12, as above shown in the summary of the evidence. After the appellant had read the statement, the sheriff read it to him in the presence of three witnesses and then asked him if it was right and if he wanted to sign it, and the appellant said it was right and signed it. The statement was then signed by three witnesses. The appellant had $46.45 and a $10 money order receipt in his possession. At this time the appellant was taken before a justice of the peace. About 7:30 P.M., on his return from the Justice Court a physical examination of the appellant revealed four scratches on the inside of the left wrist and an abrasion of the top of the right wrist.

On June 24, the appellant made another written statement to the sheriff, which is in part set out above, and the testimony reveals that before it was made the sheriff warned him in compliance with the provisions of the statute. The sheriff testified that he never told the appellant of the

nature of the evidence they had against him, or that it would be better for him to make a statement, or threatened him in any way before the second statement was made. In making the second written statement the sheriff said, "I would put down as near as possible what he told me."

The appellant was not advised that he could have and consult counsel before making the first written statement. Sheriff Saunders testified as follows:

"Q. In between times of the first written statement and the second had you told him he had a right to counsel?

"A. Yes, sir."

The appellant was affirmatively warned before the making of each written statement that he did "not have to make any statement at all, and that any statement made" could "be used in evidence against" him. The appellant never at any time requested the right to obtain or that he be provided counsel before the making of any oral or written statement, and never asked to use the telephone or that any person be notified.

The appellant relies on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, as authority for a reversal. He contends that the written statements were not admissible in evidence because he was not advised that he was entitled to be represented by counsel before making any statements, and that he had the absolute right to remain silent.

After Escobedo was arrested for murder, his attorney obtained his release by writ of habeas corpus. Some days later he was re-arrested for the same offense. When re-taken into custody he was interrogated without being allowed to see his attorney, despite repeated requests to do so by both Escobedo and his retained attorney, who was present in the building while the interrogation was in progress.

The fact that the appellant made no request to consult with an attorney and no

attorney sought to confer with him, and the further fact that he was warned, as the statute requires, that he did not have to make any statement at all, distinguish this case from Escobedo and make it evident that it does not control the result here. The contentions of the appellant are overruled. Marion v. State, Tex.Cr.App., 387 S.W.2d 56; Hinkley v. State, Tex.Cr.App., 389 S.W.2d 667; Corry v. State, Tex.Civ.App., 390 S.W.2d 763, 765.

The judgment is affirmed.

Opinion approved by the Court.