James Lee MARION, Petitioner,

v.

Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.

Civ. A. No. 5–534.

United States District Court
N. D. Texas,
Lubbock Division.

July 30, 1969.

Richard J. Clarkson and Warren Burnett, Odessa, Tex., for petitioner.

Allo B. Crow, Jr., Asst. Atty. Gen. of Texas, Austin, Tex., and James A. Mashburn, Dist. Atty., Midland, Tex., for respondent.

WOODWARD, District Judge.

### MEMORANDUM OPINION

This memorandum opinion shall constitute the necessary Findings of Fact and Conclusions of Law to support the order of the Court denying Petitioner's Petition for a Writ of Habeas Corpus.

On a plea of not guilty, a Jury in the 72nd District Court of Lubbock County, Texas, convicted Petitioner of the felony offense of murder with malice aforethought of Mrs. Fred Turner and assessed the punishment at death. The verdict was dated March 21, 1964, and the Court of Criminal Appeals of Texas affirmed the judgment and sentence on December 2, 1964, and by a later amended opinion of February 2, 1965, 387 S. W.2d 56.

In Civil Action No. 5218, of The United States District Court for the Northern District of Texas, Lubbock Division, Marion v. Harrist, Petitioner filed his Petition for a Writ of Habeas Corpus, which was denied May 5, 1965. The Court of Appeals for the Fifth Circuit affirmed, Marion v. Harrist, 363 F.2d 139, and certiorari was denied by the United States Supreme Court, 386 U.S. 934, 87 S.Ct. 960, 17 L.Ed.2d 807. Some of the grounds alleged in the petition now before this Court were raised and decided in the 1965 habeas corpus proceedings.

The present petition was first filed in the 72nd District Court of Lubbock County, Texas, and a hearing, with the Petitioner present, was held December 19, 1968. The State trial Court, after the hearing, filed its Findings of Fact and the Texas Court of Criminal Appeals denied the petition for habeas corpus without a written opinion. There was a full, complete and fair evidentiary hearing held in the State District Court on this petition.

Petitioner has exhausted his State remedies under Art. 11.07 of the Vernon's Ann.Texas Code of Criminal Procedure and has now filed his petition for such a writ in this Court setting forth twelve claims as a basis for granting same. These claims are discussed and reviewed below.

I.

(Petitioner's First, Fourth and Fifth Claims)

These claims allege grounds for relief which relate to the trial Court procedures used to determine the voluntariness of Petitioner's confessions admitted into evidence at his trial: (1) that the trial Court failed to make an independent determination of the voluntariness of defendant's two written confessions and certain oral inculpatory statements made to psychiatrists, all of which were made while Petitioner was in police custody without counsel; and (2) that the trial Court failed to charge the jury to consider the voluntariness of the confessions.

The record before this Court indicates that the trial Court held a preliminary hearing concerning the admissibility of Petitioner's written and oral confessions. (Cause No. 9290, Tr. p. 30) However, the voluntariness of these confessions was apparently not ruled on by the Court at that time and there is no indication that the voluntariness of same was challenged by Petitioner. The main thrust of Petitioner's arguments against the validity of the confessions, raised in its motion to suppress at the trial were directed at his mental capacity and lack of counsel at the time he made them. In Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court held that a defendant had a constitutional right to a fair hearing and reasonable determination on the question of voluntariness, separate and apart from the truth or falsity of the confession (378 U.S. 376–377, 84 S.Ct. 1774). The rationale of this decision is that a procedure for determining the voluntariness of a confession may come into conflict with the constitutional principle that an accused is deprived of due process of law if his conviction is founded in whole or part upon an involuntary confession, even though true, Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) and even though there is ample evidence without the confession to support the conviction, Payne v. Arkansas, 356 U.S. 560, 78 S. Ct. 844, 2 L.Ed.2d 975 (1958). Before the confession is submitted to the jury, the record of the case must indicate "with unmistakable clarity" that the trial judge made "a reliable and clearcut determination of voluntariness of the confession, including the resolution of *disputed facts* upon which the voluntariness issue may depend" 378 U.S. at 391, 84 S.Ct. at 1788 and Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed. 2d 593 (1967). (Emphasis added.) Unlike Jackson v. Denno we do not find in this case any clash or dispute as to facts in the record that would place the issue of voluntariness in question. Further the record does not show that the trial Court was requested to make its own independent finding on the question of voluntariness.

In Evans v. United States, 377 F.2d 535 (5th Cir., 1967) the Court agreed that voluntariness must be put in issue to require an independent hearing on that subject when it said:

"Appellant also contends that the trial court erred in not holding a hearing to determine whether her 'confession' to the agents was voluntary. Jackson v. Denno, 378 U.S. 368,

84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Suffice it to say that voluntariness was never put in issue. Not only was there no objection but there was no way the trial court could have been aware that the voluntariness of her oral statements to the agents was questioned. See 378 U.S. at 374, 84 S.Ct. at 1774. There must be a limit to the clairvoyance we require the trial courts to possess."

Pinto v. Pierce, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (1967), followed by Delaney v. Gladden, 397 F.2d 17 (9th Cir., 1968) require a challenged confession or that the Court must be made aware of a question of voluntariness in order to present a Jackson v. Denno argument in a federal habeas corpus hearing.

Petitioner relies on Smith v. Texas, 395 F.2d 958 (5th Cir., 1968), a case similar to the one presently before the Court. In *Smith* the defendant was charged with a heinous crime, and the question as to the voluntariness of defendant's confession was raised by both the evidence admitted and the defense attorney's objection (Marion's attorney did not object on the ground of voluntariness to the confession nor does the evidence indicate disputed facts upon which voluntariness may depend). In *Smith*, the Court overruled the objection without any comment but the evidence as to voluntariness was heard by the jury and the issue was submitted to them in the charge. The Court of Appeals for the Fifth Circuit noted that Smith's confession had already been upheld as voluntary by the Texas Court of Criminal Appeals and Federal District and Circuit Courts, however, since the trial Court did not make an independent determination of voluntariness as required by Jackson v. Denno the case was remanded to the State Court for an evidentiary hearing for the Court's determination as to voluntariness as provided for in Article 11.07 of the Texas Code of Criminal Procedure as interpreted by Ex Parte Young, 418 S.W.2d 824 (Tex. Cr.App.1967). The procedure followed

in *Smith*, a remand for an evidentiary hearing rather than reversal and remand for new trial, is in accord with the disposition of the case by the Supreme Court in Jackson v. Denno. "We cannot say that the Constitution requires a new trial if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary." 378 U.S. at 395–396, 84 S.Ct. at 1791. *Accord;* Boles v. Stevenson, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964), Williams v. Beto, 386 F.2d 16 (5th Cir., 1967).

■ Petitioner, here, is in no position to complain, for unlike the *Smith* case, the trial Court has been given an opportunity to hear this claim in the evidentiary hearing held December 19, 1968, pursuant to Article 11.07 of Texas Code of Criminal Procedure. At that time, Petitioner and his counsel were present, the record of all past proceedings were introduced into evidence and Petitioner could have taken the stand and subpoenaed witnesses to testify in his behalf. After reviewing the record and arguments of counsel the trial Court made a reliable and clear-cut determination in its Findings of Fact and Conclusions of Law that Petitioner's two written confessions were in fact, voluntary. This procedure complies with the standards set forth in Jackson v. Denno and *Smith*. For this Court to again apply the procedure followed in *Smith* and to order a determination by the trial Court as to voluntariness of the confessions would be repetitious and unnecessary.

Next petitioner contends that it was error for the trial Court not to include instructions regarding voluntariness of the confessions in the charge to the jury. The record shows no request from Petitioner's attorneys that the trial Court instruct on voluntariness as such, but their requests in this regard emphasized Petitioner's mental capacity at the time he made the confessions. The trial Court gave an instruction on that issue, instructing the jury not to consider either confession if Petitioner was insane when they were made, referring to its

earlier instructions and definitions of insanity. (Cause No. 9290, Tr. p. 44).

The Supreme Court in Jackson v. Denno was concerned only that the question of voluntariness not be confused with the question of guilt. Essentially, all that is constitutionally required is that the trial Court make an independent determination of voluntariness before submitting the confession to the jury for consideration. There appears to be no constitutional requirement in Jackson v. Denno for a further submission to the jury. See United States v. Anderson, 394 F.2d 743 (2nd Cir., 1968). Moreover, the Supreme Court made it clear that the States were to determine their own procedure: "Whether the trial judge, another judge or another jury, but not the convicting jury, fully resolves the issue of voluntariness is not a matter of concern here. To this extent * * * the States are free to allocate functions between judge and jury as they see fit." Jackson v. Denno, 378 U.S. at 391 n. 19, 84 S.Ct. at 1788–1789. At the time of Petitioner's trial Texas apparently did not follow any uniform and consistent procedure for determining the voluntariness of a confession. Texas v. Graves, 380 F.2d 676, 680–681 (5th Cir. 1967); Smith v. Texas, 236 F.Supp. 857 (S.D.Tex.1965). But see Fernandez v. Beto, 281 F.Supp. 207 (N. D.Tex.1968). (Under Texas procedure today, the Massachusetts Rule is the standard procedure. Tex. Code Crim.P., Art. 38.22.) However, the case upon which Article 38.22 is based, Lopez v. State, 384 S.W.2d 345 (Tex.Cr.App. 1964) did not require *per se* the jury to be instructed on the issue of voluntariness as the Code now specifically provides; instead, the Court said, "The jury may and shall, *upon request of the defendant,* be instructed to the effect that they cannot consider the confession unless they believe beyond a reasonable doubt that it was voluntarily made." 384 S.W.2d at 348. (Emphasis added.) The only request by Petitioner concerning jury instructions regarding the confessions related to Petitioner's insanity

at the time such confessions were made, and these instructions were given. Also, it is again pointed out that the evidence introduced was not conflicting, and the question of voluntariness was not raised by the evidence.

Petitioner also relies on Breedlove v. Beto, 404 F.2d 1019 (5th Cir., 1968). In *Breedlove* the confession in question was never introduced in evidence, however, it was injected into the trial for impeachment purposes, and to rebut petitioner's claim of self-defense. Having plead guilty the only question before the Court was whether petitioner had a viable affirmative defense. The Fifth Circuit held that the questions and answers relating to the confession were a sufficient use of the confession to invoke the rule of Jackson v. Denno. However, the Court remanded for a new trial rather than an evidentiary hearing because "Neither the trial judge nor the jury passed on the voluntariness" of the statement used. Just as in the issue before this Court, in *Breedlove* there was no contention made that the statement was involuntary and no objection to its admission as evidence was made on the ground of involuntariness. In spite of this apparent similarity *Breedlove* is distinguishable from Marion in two respects: (1) There has now been held an independent hearing by the 72nd District Court (as used in *Smith*) determining that the confessions were voluntary, and (2) the trial Court in Marion did give a requested instruction on insanity in connection with the confessions, which was the only aspect of voluntariness raised by the evidence.

There is no doubt that Marion could have raised the issue of voluntariness in its traditional context, however it is apparent from the record that counsel was attacking the confession on a narrow ground, i.e., want of counsel and lack of mental capacity. Petitioner's trial occurred just prior to *Escobedo* and it seemed clear that the former challenge was specifically kept narrow in order to raise this important question. This issue was not a jury question and there-

fore was not submitted to them in the charge. However, the issue regarding Petitioner's sanity at the time he gave the confessions was submitted in the jury charge. This was the issue urged by Petitioner; the jury heard evidence thereon and the trial judge instructed them accordingly. No objections were raised to this procedure and as a result this aspect of voluntariness, as affected by sanity, the only one raised at trial, was considered by the jury. See Hackathorn v. Decker, 369 F.2d 150, 152–157 (5th Cir. 1967). Moreover, Jackson v. Denno does not require the trial judge to hold a hearing *sua sponte* regarding the question of voluntariness; it merely deals with the procedure to be followed when the issue is raised by objection or otherwise. Lundberg v. Buchkoe, 389 F. 2d 154 (6th Cir. 1968); Evans v. United States, 377 F.2d 535 (5th Cir. 1967); Woody v. United States, 126 U.S.App. D.C. 353, 379 F.2d 130 (1967); Williams v. Anderson, 362 F.2d 1011 (3rd Cir. 1966).

■ Under this set of circumstances this Court is of the opinion that the issue as raised was properly submitted to the jury in paragraph 28 of the Court's instructions (Cause No. 9290, Tr. p. 44). Therefore only a remand for an evidentiary hearing would be required. However, since this has already been accomplished there is no need for this Court to take further action.

■ In regard to the oral inculpatory statements made to psychiatrists, there is nothing in the record indicating that any such statements were introduced in evidence against Petitioner by either Dr. Youngblood or Dr. Shaw whose testimony Petitioner sought to exclude in its motion to suppress. They testified concerning Petitioner's sanity at the time he made his confessions and his ability to recollect facts, an issue raised by Petitioner. After reviewing the record the most prejudicial statement this Court could find is far from being "highly inculpatory." See Testimony of Dr. Shaw, Statement of Facts v. III p. 651.

## II.

### (Petitioner's Second Claim)

■ Petitioner alleges error in that the trial Court refused to allow pre-trial discovery of the confessions. The Supreme Court has recognized that "better practice" would be to make confessions available by pre-trial discovery, but no reversal is required unless prejudice is shown. Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1957); Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1951). No prejudice has been shown in this case. Moreover, at the time of Marion's trial, the Texas law that neither the accused nor his attorney was entitled to pre-trial inspection of confessions, was upheld as constitutional. Hackathorn v. Decker, 369 F.2d 150, 152–153 (5th Cir. 1966), cert. den. 389 U.S. 940, 88 S.Ct. 301, 19 L.Ed.2d 294 (1966).

## III.

### (Petitioner's Third and Sixth Claims)

■ Petitioner's claims concerning the denial of right to counsel at the time he waived his examining trial and gave the confessions have been heard and passed upon following a full, fair and adequate evidentiary hearing and therefore will not be considered by this Court. See Marion v. Harrist, 363 F.2d 139 (5th Cir. 1966); Marion v. Texas, 387 S.W.2d 56 (Tex.Cr.App.1964).

## IV.

### (Petitioner's Eighth Claim)

■ Next Petitioner contends the trial Court's instruction to the jury on the question of insanity was inadequate, being so vague and indefinite as to deprive him of constitutional due process under the Fourteenth Amendment. In Blake v. United States, 407 F.2d 908 (5th Cir. 1969), the Fifth Circuit adopted the definition of insanity recommended in § 4.01 of the Model Penal Code, but this definition is not binding on the State of Texas. The charge of the trial Court

was the "right-wrong" test which is still used in many states and has never been held constitutionally inadequate.

### V.

(Petitioner's Seventh and Ninth Claims)

Petitioner here attempts to secure his writ upon the premise that the jury selection process violated the guidelines of the Supreme Court of the United States in Witherspoon v. Illinois, 391 U. S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Specifically, Petitioner claims that prospective jurors were systematically excluded by the Court if it appeared that they were conscientiously opposed to the infliction of death as a punishment for a crime, and that such systematic exclusion deprived him of a fair trial and violated his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

Petitioner is correct when he asserts that Witherspoon prohibits the sentence of death if the jury was chosen by the exclusion of veniremen for cause if they voiced only general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Too, they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. On the other hand if it appears that a prospective juror was excluded because he or she is not willing to consider all of the penalties provided by state law or that such jurors would vote against the penalty of death, regardless of the facts and circumstances that might emerge, then such exclusion for cause would be proper.

After a full, fair and complete evidentiary hearing before the 72nd District Court of Lubbock County, Texas, that Court made certain findings of fact concerning the methods used in selecting jurors and excluding same for cause at Petitioner's trial. The effect of such fact findings was that the trial Court did not exclude for cause any jurors in such a manner as to violate Witherspoon guidelines.

It is the finding and conclusion of this Court that there was more than sufficient evidence at the evidentiary hearing to support the State Court's findings of fact in this regard and such findings are in all things here found to be correct.

However, in view of the gravity of the matter before this Court, this Court has made an independent examination of the 602 pages of voir dire examination of the prospective jurors at Petitioner's trial. This examination was made for the purpose of an independent determination by this Court of the facts of such voir dire examination and for the purpose of reaching a conclusion as to whether Witherspoon guidelines were followed or violated.

A total of 71 prospective jurors were examined by the attorneys before 12 were chosen to serve as the trial jury. (Actually 13 were chosen but one was excused after being sworn for medical reasons.) 26 of these 71 can be classified as having been excused for cause in connection with the question of the imposition of the death sentence. Each venireman was first asked if he or she had any conscientious scruples against the infliction of death as a penalty for crime. If the answer was "Yes", the questioning in most cases went further. (Appendix "A" to this opinion contains the name of each prospective juror that was eventually excused for cause based on questions asked and connected with the assessment of the death penalty.) The pertinent part of the questions and answers on this point are quoted below each such venireman. (Appendix "B" is a list of the names of the remaining 71 jurors, and how they were excluded or sworn as jurors.)

While it can be said that each of these 26 had conscientious scruples against the death sentence, the analysis does not reveal that there was any systematic exclusion by the Court of these 26 because of such scruples, as claimed by Petition-

er. On the contrary, the voir dire in nearly every instance went further so as to inquire if, regardless of the facts and circumstances of the case, would that juror still refuse or be unable to vote the death penalty. In 16 of the 26, the answers are unequivocal and without doubt, that that particular juror would not vote for death regardless of the facts or circumstances. In one other instance, although there was the existence of such scruples in her mind, the record indicates that Mrs. Robbins was excused because she would require proof of guilt beyond a "shadow of doubt" rather than beyond a "reasonable doubt."

Of the remaining 9 of the 26 so classified, two were excused with the consent and agreement of defendant's counsel, and another had additional reasons for being excused other than his scruples against the death penalty. One person, the Court found, was too hesitant in her answers. Others testified "He has no right to take a man's life" or "I don't believe in capital punishment" or "I don't believe I could assess the death penalty." All of these answers imply strongly, if not expressly, that, regardless of facts and circumstances, that juror could or would not assess the death penalty.

At the Marion trial, unlike *Witherspoon*, the jurors were not excluded by an intentional application of an improper standard. There were three prospective jurors, Mrs. Hobbs, Mr. Moore and Mr. Speck who were apparently excused, according to the record, solely because they had conscientious scruples against the death penalty. At the same time, there were several members of the jury panel who expressed reservations about the death penalty even though they admitted under questioning that they could conceive of circumstances under which they could assess the punishment. Mr. Thomason when asked if he had any conscientious scruples concerning the death penalty replied, "I wouldn't know whether I do." Q. * * * "Do you feel you could assess the death penalty in a case where the law provides for it?" A.

"I never did believe in anything like that but I guess I could." Later, as it turned out, Mr. Thomason was excused by agreement for medical reasons and was not excused because of his beliefs concerning the death penalty. (Voir dire examination p. 178–80). Mr. Bray replied, "No, sir, I—yes or no, with reservations, of course * * *" "Well it would all depend on the circumstances." (Voir dire examination p. 199–200). Mrs. Hedges answered, "If the evidence proved true, then I would not have any scruples." (Voir dire examination, p. 356). Mrs. Splawn's initial response was, "I feel I would have to have more evidence. I mean I cannot decide right now." Later after further questioning as to any situation she said, "Well, I think I could * * *" Q. "And you could if you felt the facts justified it." A. "Yes." (Voir dire examination, p. 421–22).

In spite of their reservations and scruples concerning the death penalty, as set forth above, Mr. Bray, Mrs. Hedges and Mrs. Splawn actually served on the trial Court jury and Mr. Thomason was first accepted, but then was excused for medical reasons. Instead of a blanket excuse of all jurors with such conscientious scruples, three with these conscientious scruples actually served as jurors in this case.

◼ The analysis above indicates that there was no pattern or scheme or plan by the Court to exclude, systematically or otherwise, all jurors who had such scruples. On the other hand, the voir dire transcript indicates time after time, when the Court itself would question the prospective juror if he or she could under any fact or circumstance assess the death penalty, and upon receiving a negative answer, would excuse for cause that particular juror. (See voir dire examination transcript pages 269, 413, and 533.) The same type of cross-examination by defendant's attorney also elicited similar answers.

The trial Court, at the voir dire, appeared to be conscious of the *Witherspoon* guidelines although they had yet

to be enunciated by the Supreme Court, and the scheme, if any existed, was to make certain that those with conscientious scruples not be excused for cause, unless they further indicated on voir dire that under no facts or circumstances that could particular juror vote to assess the death penalty.

This was a permissible exclusion under *Witherspoon*, and Petitioner's seventh and ninth claims are not merited and these claims must be rejected.

As stated in Bell v. Patterson, 402 F. 2d 394, 399 (10th Cir. 1969), "viewing the jury selection process in its entirety by weighing the responses of the excluded and non-excluded prospective jurors, it cannot be said that 'the State crossed the line of neutrality' and entered the domain of the impartial jury proscribed by the Sixth and Fourteenth Amendments." Under the circumstances, this Court is of the opinion the jury, as constituted, expressed the conscience of the community by reflecting a cross section of society sufficient to satisfy the standards set forth in *Witherspoon*.

### VI.

#### (Petitioner's Tenth, Eleventh and Twelfth Claims)

Petitioner's tenth and eleventh claims are the same as those now pending before the Supreme Court in Maxwell v. Bishop, 393 U.S. 997, 89 S.Ct. 488, 21 L.Ed.2d 462 (1969): (1) Does State practice of allowing the jury discretion to assess the death penalty without directions or guidelines violate due process? and (2) Does the single verdict procedure used in petitioner's trial violate constitutional due process by forcing petitioner to choose between presenting evidence to mitigate punishment or maintain his privilege against self-incrimination on the question of guilt? Petitioner also contends that Texas juries tend to discriminate on grounds of race in capital sentencing for crimes against white persons. This claim is also raised in *Maxwell*, but Petitioner here has presented no statistical evidence to this

effect and therefore this allegation is a mere conclusion and without merit. The claims of Petitioner relating to the single-verdict procedure and jury guidelines have been raised before and have been denied. See e. g. Sims v. Eyman, 405 F.2d 439 (9th Cir. 1969), Segura v. Patterson, 402 F.2d 249 (10th Cir. 1968). Realizing that *Maxwell* is pending still until otherwise known, the above cases represent the presently existing law which this Court will follow.

Finally Petitioner's twelfth claim is that the imposition of the death penalty upon Marion constituted cruel and unusual punishment under Texas Law. Sims v. Eyman and Bell v. Patterson, supra, dispose with this question as related to Petitioner's due process claims made above. In regard to the claim that the death penalty is *per se* cruel and unusual punishment, this Court is of the opinion that such determination is one to be made by the Legislature rather than in the Courts.

Accordingly Petitioner's application for a writ of habeas corpus should be and is denied.

### APPENDIX "A"

1. *O. D. Rhodes*, p. 41, voir dire examination:

   Q. "You can conceive of no set of facts, regardless of the severity or aggravation of them, which should permit you as a juror to vote and write a death sentence in a case of murder, is that right?"

   A. "I believe—yes, sir, that's right."

2. *C. A. McDonald, Jr.*, p. 57, voir dire examination:

   Q. (on cross-examination) "Is there any fact situation under which you feel justified in giving the death penalty?"

   A. "Well, I just don't feel like I'd like to have any part in taking another human being's life."

   Q. "Could you in a proper case do it, whether you would like to do it or not?"

   A. "I don't believe I would."

3. *Mrs. H. E. Hughes,* p. 79 voir dire examination:

Q. "You do not feel that you personally could ever assess the death penalty?"

A. "No, Sir."

Both parties agreed to the challenge for cause of Mrs. Hughes.

4. *Mrs. Gertrude McCasland,* p. 81, voir dire:

Q. "Under any condition can you conceive of any crime or any murder, I'll put it that way, for which you could? (Referring to assessment of death penalty)

A. "In my opinion there is no reason for putting another person to death."

5. *Mrs. David J. Hobbs,* p. 103, voir dire:

The Court: "Mrs. Hobbs, do you have any conscientious scruples against the infliction of the death penalty as a punishment for a crime in a proper case? I'm talking about if you're selected on the jury."

A. "Well, that's very tough to answer."

The Court: "Well"

A. "I'm afraid I would. I'm afraid I would."

6. *B. A. Barasch,* p. 105, voir dire:

A. "Yes, I don't believe in the death penalty."

Q. "All right. You do not feel that under any conditions for any crime it should be assessed and you could * *

A. "No."

Q. "* * * not do it, is that right sir?"

A. "No."

7. *Jerry R. Dunn,* p. 163, voir dire:

A. "Well, I personally don't feel that the death penalty is ever justified because I don't think it particularly solves anything."

Later on cross-examination:

Q. "In other words, could you inflict the punishment in what you would consider a proper case?"

A. "I think I probably could."

State's challenge for cause granted because Court said there had been too much hesitation in Mr. Dunn's testimony.

8. *M. W. Moore,* p. 166, voir dire:

Q. "Do you have any conscientious scruples against the infliction of the death penalty as a punishment for crime?"

A. "Yes, Sir."

Q. "You do not believe that you could do it yourself * * *"

A. "No, Sir."

9. *L. P. McKinley,* p. 237, voir dire:

Q. "Can you conceive of any fact situation where you could consider giving the death penalty?"

A. "No."

10. *M. H. Edwards,* p. 269, voir dire examination:

The Court: "Can you conceive of any case where you might vote the death penalty, Mr. Edwards?"

A. "No, Sir, I don't believe I could."

11. *Mrs. Ruth Robbins,* p. 322, et seq., voir dire:

Excused by agreement of the parties when she testified she would assess death penalty only if defendant proven guilty "beyond a shadow of a doubt" rather than reasonable doubt. Later in response to Court's inquiry, said that guilt "would have to be beyond a shadow of a doubt" p. 327.

12. *David Nutt,* p. 368, voir dire:

Q. "I ask you, do you have any conscientious scruples or religious scruples against the infliction of death as a penalty for crime?"

A. "Yes, Sir, I don't believe in it, it's * * * I don't believe that a man has a right to take a man's life."

13. *L. L. Ahord,* p. 393, voir dire examination:

Q. "I would like to ask you, sir, if you have any conscientious scruples concerning the infliction of the death penalty as a punishment for crime in a case where the law provides for it

and the facts surrounding the situation will warrant the assessment of that punishment?"

A. "I don't believe in capital punishment."

14. *Rudolph Peel*, p. 413, voir dire examination:

The Court: "You can conceive of no situation where you could vote the death penalty if you were a juror?"

A. "No, I don't think so."

15. *Mrs. Alvin Griffin*, p. 414, voir dire examination:

Q. "Do you have any conscientious scruples which would prevent you from * * * or I'll say concerning the infliction of death as a punishment for crime wherein it's a case where the law provides for it and the facts surrounding it warrant that punishment?"

A. "Yes, I do."

Q. "You do not believe that you could assess the death penalty?"

A. "No, I don't."

16. *Mrs. Fae Sheppard*, p. 447, voir dire:

Q. "Now then, my question to you is, do you have any conscientious or religious scruples against the infliction of the death * * *"

A. "Yes, sir."

Q. "* * * or a penalty for crime in a proper case?"

A. "I do."

Q. "What?"

A. "I don't believe in death."

Q. "You don't believe in giving death for crime in a proper case * * *"

A. "No."

Q. "* * * You being the judge of what the proper case is, is that right?"

A. "I don't believe in it."

Defendant agreed to excuse this venireman.

17. *Wenifred S. McKee*, p. 450, voir dire:

After stating he had conscientious scruples about the death penalty:

Q. (on cross examination by defendant) "You just don't believe in it as a basic philosophy, is that it?"

A. "Well, that's right."

Defendant agreed to excuse this venireman.

18. *S. B. Nelson*, p. 464, voir dire:

(On cross examination)

Q. "Do you think you could give the death penalty under certain circumstances, in the proper case?"

A. "Under what?"

Q. "Under certain circumstances, under a proper case, do you feel like you could administer it?"

A. "Well, I think I'd rather not. I could go a life term but not a death sentence."

Defendant thereupon agreed to excuse this venireman.

19. *Homer L. Bogard*, p. 351:

A. "Well, I don't believe in that capital punishment."

Q. "You don't believe in the death penalty?"

A. "Not in capital punishment."

Q. "Well, that's what I'm talking about. You, yourself, could not vote in any case—I'm not talking about this case, in any case for the death penalty? Is that right?"

A. "That's right."

20. *M. E. Cobb*, p. 533:

After testifying that he could not personally give the death penalty:

The Court: "You can't conceive of any case where you could vote for the death penalty—any state of facts in a case that you could vote for the death penalty if you were a juror in a case?"

A. "I don't believe so, your Honor."

21. *T. A. Peel*, p. 535, voir dire examination:

Q. "Can you conceive of any crime, regardless of what the law says about it, can you conceive of any crime bad

enough for you to vote for the death penalty?"

A. "I don't * * * no, sir."

22. *Robert A. Burhart*, p. 536, voir dire examination:

A. "I don't believe that God's law provides for it, in my case. I wouldn't vote the maximum penalty."

Q. "You personally would not vote for the maximum penalty * * *"

A. "That's correct."

Q. "* * * in a case regardless of what the facts were in it?"

A. "That's correct."

23. *Bill Westerfield*, p. 569, voir dire examination:

Q. "Do you have any conscientious scruples concerning the infliction etc. * * *"

A. "Yes, sir, I do. I wouldn't under any circumstances."

Q. "Assess the death penalty?"

A. "No, sir, I would not."

24. *Mozelle F. Cobb*, p. 571, voir dire examination:

Q. "Uh-huh, do you have scruples concerning the assessment of the death penalty?"

A. "Yes, sir, I do."

Q. "Do you feel that under any circumstances that you, yourself, could vote to assess the penalty if you found the man guilty of crime?"

A. "No, I couldn't."

25. *W. J. Blair*, p. 572, voir dire examination:

Q. "Do you have conscientious scruples concerning the infliction of the punishment of death as a penalty for crime?"

A. "Yes, sir, I do. I wouldn't."

Q. "You would not assess the death penalty?"

A. "No, sir, I wouldn't under no circumstances."

26. *J. W. Speck*, p. 589 et seq., voir dire examination:

A. "* * * I would ask you, sir, if you have any conscientious scruples concerning the infliction of the penalty of death as a punishment for crime where the law provides it, as it does in a case of this nature, and the facts were sufficient to show you that it should be assessed or to show that it should be?"

A. "That's pretty rough."

Q. "Yes, sir, I know it's rough. It's a rough situation."

A. "I'd hate awful bad to say that a man should be—should die, but I—"

Q. "Well, —"

A. "— I may —"

Q. "— I understand that, I don't think any of us would take that lightly, Mr. Speck. The question is, and it boils down to this, it's your conscience we're talking about and I'm asking you about your conscientious scruples. Do you feel that you could sit on a jury and if the State met the burden of proving the man guilty, do you feel that you could personally vote to put him to death?"

A. "It's doubtful. I might but it's doubtful."

Mr. Griffin: "Your Honor, I'd challenge for cause on this answer."

Mr. Blanchard: "Let—may I ask one question, Judge?"

The Court: "Yes, sir."

(On cross examination, by Mr. Blanchard)

Q. "Mr. Speck, do you concede—can you conceive of any case—now, we're not talking about this one, can you conceive of any situation where you could sit as a juror and because of the circumstances surrounding the case, if you were convinced that a person who was being tried was guilty and the facts were such—of such a nature and degree that you could render a verdict of death in that case?"

A. "I believe that if the proof was showed where it was beyond hope, I would render the verdict, yes."

Q. "Now, this burden, of course, is not the burden I'm talking about. In

other words, the State has the burden of proving a defendant guilty in a case. They—they're required to prove him guilty beyond a reasonable doubt. In other words, that's as best could be described a doubt with reason. If it were beyond that point and the circumstances were such that you felt—a person felt that it should be, could you in that case render a verdict if you were sure beyond a reasonable doubt that he was guilty and so on?"

A. "Well, that's—let me put it this way, maybe I misunderstood it. If I felt that the man was hopeless, so to speak, I would render a verdict, yes, sir."

### APPENDIX "B"

(Jurors questioned on voir dire examination in addition to those shown in Appendix "A")

Truman E. Bradshaw, excused by State—preemptory challenge.

Samuel O. Thomas, excused by State—preemptory challenge.

Lester Conner, excused by Defendant, preemptory challenge.

W. L. Patterson, accepted as a juror.

C. T. Read, challenged for cause regarding his attitude regarding alcohol and temporary insanity.

J. A. Brunson, challenged for cause—had opinion as to guilt or innocence.

Cecil Griffin, excused by State, preemptory challenge.

John P. Cates, challenged for cause—had opinions regarding case.

A. L. Davis, excused for cause, had fixed opinion about sanity of Defendant.

H. P. Clemons, excused by State, preemptory challenge.

Gus Thomason, excused by agreement because of illness.

Richard W. Brag, selected as juror.

Lucille M. Stewart, excused by State—preemptory challenge.

W. C. Lawrence, excused by State, preemptory challenge.

Mrs. Paul Newman, excused for cause of pre-existing opinion as to case.

Albert Salones, excused by Defendant, preemptory challenge.

R. E. Sikes, sworn as a juror.

C. H. Irwin, excused by State, preemptory challenge.

Mrs. Ruth Seveland, sworn as a juror.

Donald Jackson, excused by Defendant, preemptory challenge.

Mrs. Herman Biggerstaff, sworn as a juror.

Donald H. Finkner, excused by Defendant, preemptory challenge.

Mrs. Charles R. Hedges, sworn as a juror.

Roy D. Sifford, both sides challenge for cause—fixed opinions about case.

Harold R. Bolton, challenged for cause, prejudiced about guilt or innocence.

Mrs. Eula B. Campbell, excused by State, preemptory challenge.

Boyce M. Irwin, sworn as a juror.

Troy Bartlett, sworn as a juror.

W. J. Pierson, excused by defendant's preemptory challenge.

E. M. Willbanks, excused by defendant's preemptory challenge.

Mrs. Robert C.          , excused, has opinion about case.

Mrs. Robert Splawn, sworn as a juror.

R. C. Standifer, excused by defendant's preemptory challenge.

H. F. McInroe, excused by defendant's preemptory challenge.

Richard E. Featherton, excused by State's preemptory challenge.

L. V. Light, excused for cause—because he would require proof of insanity more than required by law.

Chester H. Smith, sworn as a juror.

William D. Blevins, excused by defendant's preemptory challenge.

W. F. Martin, excused because of medical reasons—too deaf to hear.

James O. Acuff, excused—had a preconceived idea about defense.

John L. Dea, excused by State's preemptory challenge.

Buddy Hughes, excused—relationship with deceased such that he could not be a fair juror.

O. R. Cunningham, sworn as a juror.

J. W. Hunt, excused, pre-conceived idea about insanity.

B. L. McCasland, sworn as a juror.